UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

---

C.T., through his next of friend MONICA SULLIVAN,

      Plaintiff,

  v.

CADDO PARISH SCHOOL BOARD; and TELLAUANCE GRAHAM, in his individual capacity,

      Defendants.

---

CASE NO. 19-cv-_____

JUDGE _____

MAGISTRATE JUDGE _____

**JURY TRIAL DEMANDED**

## **COMPLAINT**

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Emily A. Westermeier (LA # 36294)
ewest@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

**PRELIMINARY STATEMENT**

1. At the times relevant to this action, C.T. was an autistic, non-verbal individual. C.T. lives with his mother and father. In August 2017, C.T. began the 2017-2018 school year in the tenth grade at Huntington High School ("HHS"), which is a part of the Caddo Parish Public School system. C.T. had been a student at HHS since 2015. C.T. receives special services in the school's program for children with severe and profound autism; specifically, he attended classes in a small, self-contained environment with other students with severe and profound disabilities. C.T. has no history of disciplinary issues at HHS.

2. C.T. is severely disabled and often has two paraprofessionals that assist him at school. Upon information and belief, in or around September 2017, Marlon Jackson was assigned as one of C.T.'s paraprofessionals. Anthony Watley was also assigned as C.T.'s paraprofessional beginning in December 2017. Paraprofessionals are supposed to perform general duties around the facility, support students' physical and emotional health and safety, and assist students with developing appropriate social skills.

3. When Mr. Watley was first assigned as C.T.'s paraprofessional, he witnessed several instances of Mr. Jackson physically abusing C.T., including punching C.T. with closed fists and restraining C.T. for excessive periods of time while applying his entire body weight on top of him. Mr. Jackson would also take C.T. to the "Darkroom" where he could "break C.T. down" for "bad behavior" in a private setting.

4. Mr. Watley was upset and disturbed by Mr. Jackson's behavior. Upon information and belief, Mr. Watley tried to speak with TELLAUANCE GRAHAM, then-Principal of HHS, about Mr. Jackson's abusive behavior prior to HHS' Winter Break in 2017. Mr. Watley ultimately sent TELLAUANCE GRAHAM an email on February 12, 2018 detailing the abuse of

C.T. that he witnessed by Mr. Jackson. Mr. Watley also informed TELLAUANCE GRAHAM that he believed there was a video of Mr. Jackson abusing C.T. while in class at HHS that was recorded by another paraprofessional working that classroom.

5. During a February meeting with HHS school officials to go over C.T.'s Individualized Education Program ("IEP"), MONICA SULLIVAN, C.T.'s mother and guardian, was informed by TELLAUANCE GRAHAM that Mr. Jackson would no longer be assigned as C.T.'s paraprofessional because he had been "inappropriate." No further details were provided to MONICA SULLIVAN about the circumstances surrounding Mr. Jackson's removal. Mr. Watley remained assigned as C.T.'s paraprofessional. Upon information and belief, TELLAUANCE GRAHAM took no other actions to investigate or report Mr. Jackson's abuse of C.T. to other school officials or law enforcement.

6. Upon information and belief, TELLAUANCE GRAHAM left his position as HHS Principal at the end of the 2017-18 school year. Upon information and belief, TELLAUANCE GRAHAM had been an employee of the Caddo Parish Public School system since 2002.

7. C.T. remained a student at HHS throughout the 2017-18 school year and began the 2018-19 school year. In late September 2018, C.T. missed his bus and MONICA SULLIVAN drove him to school. When they arrived at HHS, MONICA SULLIVAN saw Mr. Jackson on campus, apparently still employed at HHS. MONICA SULLIVAN was upset and confused as to why Mr. Jackson was still working at HHS when he had been "inappropriate" with C.T. Monica Sullivan immediately attempted to contact the new HHS Principal, Dr. Matthew Mitchell, regarding Mr. Jackson's employment at HHS.

8. On September 26, 2018, Mr. Watley forwarded MONICA SULLIVAN a copy of

the email he sent to TELLAUANCE GRAHAM regarding Mr. Jackson's physical abuse of C.T. This was the first time MONICA SULLIVAN was aware of the extent and nature of Mr. Jackson's "inappropriate" actions towards her son. MONICA SULLIVAN forwarded the email to the new HHS Principal, as well as other HHS school administrators shortly thereafter.

9. After MONICA SULLIVAN forwarded the email from Mr. Watley to the new HHS Principal and other HHS school administrators, upon information and belief, Mr. Jackson was placed on administrative leave and a criminal investigation was initiated by the Shreveport Police Department.

10. As a result of this investigation, Mr. Jackson was charged with simple battery of C.T. by the Shreveport Police Department on November 1, 2018.

11. As a result of the abuse inflicted by Mr. Jackson, C.T. suffered serious emotional distress, trauma, anxiety, fear, depression, and invasion of his civil rights. After suffering physical abuse at the hands of Mr. Jackson, C.T. would lash out with aggression towards his family, which was a departure from his normal calm demeanor.

12. MONICA SULLIVAN sues on behalf of C.T. as his next of friend and seeks compensatory, and nominal damages and attorneys' fees and costs to redress CPSB'S unlawful discrimination for violations of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), et al. and Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-34, and its regulations 28 C.F.R. Parts 35 and 36. With regards to C.T.'s request for nominal damages, it is C.T.'s position that an award of nominal damages would confer significant civil rights to the public, as a judgment in his favor against DEFENDANTS, regardless of the amount, would deter DEFENDANTS from discriminating against individuals with autism in the future.

13. MONICA SULLIVAN also seeks compensatory and punitive damages, as well as

attorney's fees and costs against HHS principal TELLAUANCE GRAHAM, in his individual capacity, for violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

## THE PARTIES

14. C.T. is an individual residing in Shreveport, Louisiana. C.T. has severe and profound autism, as a result of his disability, is non-verbal. C.T. also has ADHD and is prone to manic episodes. C.T. is 5 foot, 3 inches tall and weighs approximately 116 pounds. C.T. is very active and enjoys running along the track at HHS. As an individual with autism, C.T. is substantially limited in several major life activities including hearing, speaking, thinking, and brain function. In fact, under Title II of the ADA, autism is an impairment that leads to a predicable assessment of a disability. *See* 28 C.F.R. § 35.108(d)(2)(iii). As such, C.T. is a qualified person with a disability within the meaning of the ADA.

15. MONICA SULLIVAN (hereinafter "MS. SULLIVAN") is the mother of C.T. and brings suit on C.T.'s behalf as his next friend.

16. Defendant CADDO PARISH SCHOOL BOARD (hereinafter "CPSB") is a public entity organized in the State of Louisiana and providing services in Caddo Parish, Louisiana.

17. Upon information and belief, CPSB's primary address is 1961 Midway Avenue, Shreveport, LA 71130.

18. Defendant TELLAUANCE GRAHAM (hereinafter "MR. GRAHAM") is a natural person currently residing in Cedar Hill, Texas. He was the Principal of HHS, which is operated by CPSB, during the 2017-18 school year.

19. As the Principal at HHS, MR.GRAHAM has a duty to exercise reasonable care in the supervision and protection of students at HHS.

20. As the operator, administrator, and provider of services at HHS, CPSB is obligated to ensure that the manner in which it provides these services complies with the requirements of the ADA and does not discriminate against persons with disabilities, including individuals who have autism and limited communication abilities.

## JURISDICTION & VENUE

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for C.T.'s claims arising under federal law. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(3) & (4) because this litigation involves claims for deprivation of civil rights under 28 U.S.C. § 1983 and the United States Constitution.

22. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because CPSB resides within the jurisdiction of this District and a substantial part of the events that give rise to the claims occurred in this District.

## STATEMENT OF FACTS

23. In August 2015, C.T. enrolled at HHS as a ninth grader. C.T. was assigned to Richard Simpson's classroom. During the 2017-18 school year, C.T. was a tenth grader at HHS and was still assigned to Mr. Simpson' classroom. In or around November 2017, Marlon Jackson was assigned as one of C.T.'s paraprofessionals. In or around December 2017, Anthony Watley was assigned as C.T.'s other paraprofessional. MR. GRAHAM was the Principal of HHS during the 2017-18 school year, and upon information and belief, had been Principal for several years prior.

24. Upon information and belief, C.T. has no history of formal discipline at HHS.

25. Anthony Watley, the other paraprofessional assigned to C.T., observed the

incidents of abuse detailed below shortly after being assigned as C.T.'s paraprofessional in December 2017.

26. Upon information and belief, Mr. Watley attempted to meet with MR. GRAHAM prior to the 2017 Winter Break to bring this abuse to his attention, but MR. GRAHAM chose not to make time for at meeting.

27. Given that MR. GRAHAM chose not to make time for a meeting, on or around February 12, 2018, Mr. Watley sent MR. GRAHAM an email that detailed the abuse he personally witnessed Mr. Jackson inflict upon C.T.

28. Upon information and belief, Mr. Jackson's abuse of C.T. took several forms and occurred in several locations around the HHS campus:

- Mr. Jackson would take C.T. to walk the HHS track, where he would punch C.T. with closed fists;

- Mr. Jackson would refer to the "track" as a code word for punishing C.T.;

- Mr. Jackson would use bathroom breaks as an opportunity to physically abuse C.T. in private;

- Mr. Jackson would physically abuse C.T. in the classroom, and upon information and belief, another paraprofessional assigned to Mr. Simpson's classroom recorded a video of this abuse;

- Mr. Jackson would restrain C.T. using chair restraints for excessive periods of time;

- When C.T. was restrained, Mr. Jackson would put his knees on C.T.'s back and/or his entire body weight on C.T. Upon information and belief, Mr. Jackson is close to 6 feet tall and weighs 240 pounds;

- When C.T. was restrained, Mr. Jackson would punch C.T. with a closed fist in the legs in an attempt to give C.T. a leg cramp;

- Mr. Jackson would regularly refer to C.T. as a "savage" and explained to other paraprofessionals that he had to use physical force to control C.T.; and

- Mr. Jackson would take C.T. to the "Darkroom" where he could abuse C.T. in private.

29. Upon information and belief, Mr. Jackson's physical abuse of C.T. had no legitimate educational or disciplinary purpose and was unrelated to maintaining an atmosphere conducive to learning.

30. Upon information and belief, another paraprofessional in C.T.'s class forwarded the video of Mr. Jackson abusing C.T. to MR. GRAHAM in February 2018.

31. Upon information and belief, MR. GRAHAM had actual knowledge of the abuse inflicted upon C.T. by Mr. Jackson since at least February 12, 2018, when he received the email from Mr. Watley.

32. Upon information and belief, MR. GRAHAM had actual knowledge of the abuse inflicted upon C.T. by Mr. Jackson since before February 12, 2018 because he failed to make time for a meeting with Mr. Watley.

33. On or around February 22, 2018, MR. GRAHAM was present at an IEP meeting for C.T. where he informed MS. SULLIVAN that Mr. Jackson was no longer assigned as one of C.T.'s paraprofessionals. MR. GRAHAM'S only explanation for removing Mr. Jackson as C.T.'s paraprofessional was that Mr. Jackson had been "inappropriate" with C.T. MR. GRAHAM did not inform MS. SULLIVAN that Mr. Jackson had been accused of physically

abusing C.T.

34. MR. GRAHAM did not inform MS. SULLIVAN that C.T. should be evaluated by a medical professional or that C.T. should be evaluated for abuse or trauma.

35. MR. GRAHAM did not inform MS. SULLIVAN of the seriousness of the abuse committed by Mr. Jackson.

36. After the February 22, 2018 IEP meeting, Mr. Watley continued to work as C.T.'s paraprofessional.

37. In or around September 2018, MS. SULLIVAN drove C.T. to school because he missed the school bus. Upon arrival at the school, MS. SULLIVAN was shocked to see Mr. Jackson on the HHS campus. MS. SULLIVAN inquired about Mr. Jackson's presence at the school and was informed by Mr. Watley that he still worked at HHS after he was dismissed as C.T.'s paraprofessional.

38. On September 26, 2018, Mr. Watley forwarded MS. SULLIVAN the email he sent to MR. GRAHAM that detailed the abuse inflicted upon C.T. by Mr. Jackson. This was the first time MS. SULLIVAN became aware of the nature and extent of the allegations against Mr. Jackson. Prior to that date, MS. SULLIVAN had never been informed by MR. GRAHAM or any other CPSB administrator that C.T. had been physically abused by Mr. Jackson.

39. C.T. was unable to tell his mother or any employee at HHS about the abuse inflicted by Mr. Jackson because he severely limited in life activities and nonverbal due to his severe and profound autism.

40. C.T.'s disability was open, obvious, and apparent.

41. C.T.'s limitations to thinking, speaking, and communicating were open obvious, and apparent.

42. Upon information and belief, Mr. Jackson's abuse of C.T. caused C.T. to lash out aggressively and without provocation. As a result of the abuse, C.T.'s demeanor changed at home, where he became more aggressive with his mother and home health aides.

43. Pursuant to CPSB's Policy Manual, "[n]o form of corporal punishment shall be administered to a student with an exceptionality, excluding gifted and talented, as defined in La. Rev. Stat. Ann. §17:1942 or to a student who has been determined to be eligible for services under Section 504 of the Rehabilitation Act of 1973 and has an Individual Accommodation Plan."

44. Pursuant to CPSB's Policy Manual, written allegations of impermissible corporal punishment or moral offenses regarding students shall be promptly investigated. This includes reporting the allegations to the appropriate school director and the Department of Risk Management.

45. Upon information and belief, MR. GRAHAM did not follow CPSB policy for investigating written allegations of improper corporal punishment or moral offenses regarding students.

46. Pursuant to LA CH CODE Tit. VI, Art. 609 (1), "any mandatory reporter who has cause to believe that a child's physical or mental health or welfare is endangered as a result of abuse or neglect… shall report in accordance with Article 610."

47. Pursuant to LA CH CODE Tit. VI, Art. 603 (17)(d), school principals are mandatory reporters.

48. Upon information and belief, MR. GRAHAM was a mandatory reporter in February 2018 when he received the email from Mr. Watley containing allegations of abuse of C.T. by Mr. Jackson.

49. Upon information and belief, MR. GRAHAM did not report the allegations of abuse of C.T. by Mr. Jackson to any law enforcement agency.

50. Upon information and belief, MR. GRAHAM did not report the allegations of abuse of C.T. by Mr. Jackson to any other CPSB administrators.

51. Upon information and belief, MR. GRAHAM did not disclose the full nature and substance of the allegations of abuse of C.T. by Mr. Jackson to MS. SULLIVAN, C.T.'s mother and guardian.

52. Upon information and belief, MR. GRAHAM did not open a formal investigation into the allegations of abuse of C.T. by Mr. Jackson.

53. Upon information and belief, the only action MR. GRAHAM took after he learned of the allegations of abuse of C.T. was to reassign Mr. Jackson to work in another classroom on HHS's campus, where he would still have access to C.T. and other HHS students.

A. *Tellauance Graham's deliberate indifference to allegations of abuse of C.T. violated C.T.'s Fourteenth Amendment Due Process right to be free from bodily harm.*

54. C.T. repeats and realleges all preceding paragraphs in support of this claim.

55. As a student at HHS, C.T. has a Fourteenth Amendment right to bodily integrity to be free from physical abuse at the hands of HHS employees.

56. While employed as C.T.'s paraprofessional at HHS, Mr. Jackson violated C.T.'s Fourteenth Amendment constitutional right to bodily integrity by physically abusing him while assigned as his paraprofessional.

57. MR. GRAHAM had an obligation to report allegations of abuse by CPSB employees to law enforcement pursuant to L.A. Rev. Stat. § 14:403.

58. MR. GRAHAM had an obligation to report the details of the abuse of C.T. to MS. SULLIVAN, his mother and guardian.

59. Upon information and belief, as a sixteen-year employee of the Caddo Parish School system, MR. GRAHAM was familiar with the CPSB Policy Manual and his duty to investigate allegations of abuse, report allegations of abuse to CPSB's Department of Risk Management, and report allegations of abuse to law enforcement.

60. MR. GRAHAM had actual knowledge since at least February 2018 that Mr. Jackson had violated C.T.'s Fourteenth Amendment right to bodily integrity by physically abusing C.T. while assigned as his paraprofessional at HHS.

61. MR. GRAHAM was deliberately indifferent to Mr. Jackson's violation of C.T.'s constitutional rights because he failed to report or investigate the allegations against Mr. Jackson.

62. MR. GRAHAM was deliberately indifferent to Mr. Jackson's violation of C.T.'s constitutional rights because he allowed Mr. Jackson to remain employed as a paraprofessional on HHS campus, where he would continue to have access to C.T.

63. MR. GRAHAM made a conscious choice to endanger C.T.'s constitutional rights because he allowed Mr. Jackson to remain on HHS campus even after he had notice that Mr. Jackson was accused of abusing of C.T.

64. MR. GRAHAM knew that C.T. was non-verbal and would be unable to report any further physical abuse he suffered at the hands of Mr. Jackson.

65. MR. GRAHAM'S inaction in the face of allegations of Mr. Jackson's abuse of C.T. allowed Mr. Jackson to remain on HHS campus where he could still have access to and contact with C.T.

66. MR. GRAHAM condoned Mr. Jackson's actions by not instituting an investigation into the allegations of abuse of C.T. by Mr. Jackson, as was required per Louisiana law and CPSB's Policy Manual.

67. MR. GRAHAM exacerbated Mr. Jackson's abuse by minimizing the abuse and failing to disclose the full nature and extent of the abuse to MS. SULLIVAN in a timely manner. By minimizing the abuse and failing to disclose the full extent of the abuse, MS. SULLIVAN was unable to seek immediate remedial medical and psychological treatment for C.T.

68. By allowing Mr. Jackson to remain employed by CPSB and present on HHS campus, MR. GRAHAM caused C.T. to experience greater levels of fear, anxiety, indignity, humiliation, and emotional distress.

B. *C.T. Experienced Serious Damages as a Result of CPSB and Tellauance Graham's Complete Failure to Accommodate his Disability.*

69. C.T. repeats and realleges all preceding paragraphs in support of this claim.

70. Upon information and belief, MR. GRAHAM failed to reasonably accommodate C.T. because he did not investigate the allegations of abuse suffered at the hands of Mr. Jackson.

71. CPSB, through MR. GRAHAM, knew or should have known of its obligations under the ADA to accommodate individuals with disabilities, including individuals who have autism, and to develop policies to promote compliance with these statutes.

72. CPSB, through MR. GRAHAM, knew or should have known that its actions and/or inactions created an unreasonable risk of causing C.T. to experience greater levels of fear, anxiety, indignity, humiliation, and emotional distress than a non-disabled person would be expected to experience.

73. The harm sustained by C.T. herein is the expected and foreseeable consequence of CPSB'S failure to comply with the requirements and mandates of federal civil rights laws. These statutes and accompanying regulations exist to ensure that individuals with disabilities will have full use of all services, programs, and activities provided or made available by public entities. When CPSB failed to adhere to its obligations under these statutes and regulations, it was

imminently foreseeable that C.T. would sustain the exact harms alleged in this lawsuit.

74. Despite CPSB'S knowledge of its obligation to accommodate persons with disabilities and avoid discrimination – including individuals that have autism – CPSB did not take adequate steps to ensure that it accommodated C.T. Nor did CPSB take adequate steps to avoid discrimination on the basis of disability.

75. CPSB discriminated against C.T. with deliberate indifference to his rights under the ADA.

76. Based on the facts alleged above, CPSB intentionally discriminated against C.T.

77. Further, CPSB, through MR. GRAHAM, was purposeful in its choices, which is sufficient to constitute intentional discrimination under the ADA.

### CLAIM FOR RELIEF I: VIOLATIONS OF 42 U.S.C. § 1983 UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS TO MR. GRAHAM IN HIS INDIVIDUAL CAPACITY ONLY

78. C.T. repeats and realleges all preceding paragraphs in support of this claim.

79. At all times relevant to this complaint, C.T. had a clearly established substantive due process right to be free from physical abuse and violations to his bodily integrity.

80. Defendant MR. GRAHAM at all relevant times was an employee of Defendant CPSB, acting under color of law, who had supervisory duties and responsibilities with respect to his subordinate, Mr. Jackson, also a CPSB employee.

81. Defendant MR. GRAHAM had actual knowledge of that Mr. Jackson engaged in conduct that posed a pervasive an unreasonable risk of constitutional injury to C.T., including punching and restraining C.T., as well as having unsupervised access to C.T. in the "Darkroom" where Mr. Jackson could physically abuse C.T. in private.

82. MR. GRAHAM'S response to this actual knowledge was so inadequate as to

show deliberate indifference to or tacit authorization of Mr. Jackson's offensive misconduct against C.T.

83. MR. GRAHAM'S response to this actual knowledge exhibited reckless and/or callous indifference to C.T's federally protected rights.

84. MR. GRAHAM took inadequate action to supervise, monitor, or investigate Mr. Jackson's interactions with C.T.: MR. GRAHAM did not inform CPSB administrators or law enforcement about the allegations against Mr. Jackson, did not open any formal investigation into the allegations of abuse, and did not inform MS. SULLIVAN about the allegations of abuse so that C.T. could seek treatment for emotional and/or physical injuries resulting from the abuse.

85. As a direct and natural consequence of MR. GRAHAM'S actions, inactions, and deliberate indifference to and violation of C.T.'s clearly established Constitutional rights, C.T. suffered, and continues to suffer injuries including, without limitation, emotional distress and psychological trauma.

86. C.T. is therefore entitled to punitive damages, compensatory damages, and attorneys' fees, costs and expert expenses.

### CLAIM FOR RELIEF 2: VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT AS TO CADDO PARISH SCHOOL BOARD

87. C.T. repeats and realleges all preceding paragraphs in support of this claim.

88. At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131, *et seq*. has been in full force and effect and has applied to CPSB'S conduct.

89. At all times relevant to this action, the U.S. Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to the CPSB's conduct.

90. At all times relevant to this action, C.T. has been substantially limited in several major life activities, and as such is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

91. CPSB is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1).

92. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

93. Federal regulations implementing Title II of the ADA provide that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

94. Federal regulations implementing Title II of the ADA further provide that "a public entity shall operate each service, program, or activity so that the service, program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

95. Federal regulations implementing Title II of the ADA further provide that a public entity may not "Otherwise limit a qualified individual with a disability in the enjoyment of any

right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(vii).

96. CPSB violated Title II of the ADA by excluding C.T. from participation in or denying the benefits of services, programs, or activities of the public school system by reason of his disability, and subjecting him to discrimination by CPSB by reason of his disability.

97. CPSB failed to properly investigate and report allegations of abuse of C.T. by his paraprofessional, Mr. Jackson. As a result, C.T. was denied the benefit or services, programs and activities in his public school by CPSB in violation of the ADA, 42 U.S.C. § 12132.

98. By and through their actions set forth above, CPSB discriminated against C.T. on the basis of disability, in violation of Title II of the ADA and its implementing regulations.

99. C.T. is therefore entitled to declaratory relief, compensatory and nominal damages, and attorneys' fees, costs, and expert expenses.

### CLAIM FOR RELIEF 3: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT AS TO CADDO PARISH SCHOOL BOARD

100. C.T. repeats and realleges all preceding paragraphs in support of this claim.

101. At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, has been in full force and effect and has applied to CPSB's conduct.

102. At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to CPSB's conduct.

103. At all times relevant to this action, C.T. had substantial limitations in several major life activities including hearing, speaking, thinking, and brain function and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9).

104. At all times relevant to this action, CPSB has been offering programs, services, activities, or accommodations receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

105. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

106. The Rehabilitation Act extends relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).

107. CPSB failed to properly investigate and report allegations of abuse of C.T. by his paraprofessional, Mr. Jackson. As a result, C.T. was denied the benefit or services, programs and activities in his public school by CPSB in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

108. CPSB discriminated against C.T., on the basis of disability, in violation of 29 U.S.C. § 794.

109. C.T. is therefore entitled to seek and recover compensatory and nominal damages for the injuries and loss he sustained as a result of CPSB's discriminatory conduct as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

110. C.T. is further entitled to an award of attorneys' fees, and costs (including expert expenses) pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a).

## PRAYER FOR RELIEF

**WHEREFORE,** C.T. respectfully prays that this Court grant the following relief against TELLAUANCE GRAHAM and the CADDO PARISH SCHOOL BOARD:

A.  Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that CPSB'S policies, procedures, and practices subjected C.T. to unlawful discrimination in violation of the ADA and RA;

B.  Award to C.T.:

  i.  Punitive and compensatory damages pursuant to 42 U.S.C. § 1983;

  ii.  Reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1983;

  iii.  Compensatory and nominal damages pursuant to the ADA;

  iv.  Reasonable costs and attorneys' fees pursuant to the ADA;

  v.  Interest on all amounts at the highest rates and from the earliest dates allowed by law;

  vi.  Any and all other relief that this Court finds necessary and appropriate.

## DEMAND FOR JURY TRIAL

C.T. demands trial by jury on all issues.

Dated: January 28, 2019

Respectfully Submitted,

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Emily A. Westermeier (LA # 36294)
ewest@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By:/s/ Emily A. Westermeier
     Emily A. Westermeier